**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| WAYNE B. HERRMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-1123-RDR |
| | ) | |
| | ) | |
| RAIN LINK, INC. a Kansas | ) | |
| Corporation; DENNIS DIXON, | ) | |
| individually and in his capacity as Officer, Director | ) | |
| and shareholder in Rain Link, Inc. | ) | |
| SHONDA CHAPA, individually and in her | ) | |
| capacity as Officer, Director, and Shareholder | ) | |
| in Rain Link, Inc. | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This case is what happens when a business relationship among several partners goes bad. Plaintiff Wayne Herrmann and defendants Dennis Dixon and Shondra Chapa were formerly partners in a sprinkler and irrigation business known as Rain Link, Inc. (RLI). Plaintiff was terminated from his employment with RLI in 2009. In this action, plaintiff asserts claims against RLI under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. He alleges disability discrimination and retaliation under Title I and accommodation discrimination under Title III. Plaintiff asserts Kansas state law claims against RLI for unlawful employment practices under the Kansas Act Against Discrimination (KAAD), K.S.A. § 44-1001 et seq., and for willful violations of the Kansas Wage Payment Act (KWPA), K.S.A. § 44-312 et seq. Finally, plaintiff alleges Kansas common law claims against Dixon and Chapa for breach of fiduciary duty and oppression of his rights as a minority shareholder. This matter is presently before the court upon defendants' motion for summary judgment.

I.

Some comments are in order before the court addresses the claims and arguments of the parties. The court is concerned by the delay that has taken place in this litigation. The court may be at fault for some of that delay, but the court believes that much of it is due to the over-litigation by the parties. The sheer number of pages that have been generated by the parties reflects this over-litigation. The conduct of the parties has unnecessarily consumed scarce judicial resources. In noting the over-litigation by the parties, the court also notes that parties have also failed to address certain issues and overlooked arguments raised by the opposing party. With that said, the court shall turn to the many claims, issues and arguments raised in this case.

II.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. See Anderson,

477 U.S. at 256.   A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial.   Id.   Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.   See id.

When reviewing a motion for summary judgment, the court should keep in mind three principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson, 477 U.S. at 249. Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party.   See Hunt v. Cromartie, 526 U.S. 541, 550–55 (1999). Third, the court cannot decide any issues of credibility. See Anderson, 477 U.S. at 255.

The court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."   Celotex, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

### III.

The following facts are uncontroverted.   Many other facts are disputed.   The court shall consider some of the disputed facts as we consider the arguments raised by the parties.

**RLI History and Background**

RLI was incorporated in 2000.   At the time of incorporation, the stockholders were Hermann, Dixon and Mark Marnell, each of whom was issued 100 shares of common stock. The Articles of Incorporation were filed with the Kansas Secretary of State on November 2, 2000.

RLI was created to take over the operations of two businesses, Stan's Sprinkler Service, Inc. (Stan's) and Rain Pro Irrigation, Inc. (Rain Pro). Stan's was owned by Stan Garnett, Dixon and Earl Peters in 1994. Rain Pro was another company owned by Stan's. RLI continued to do business as Stan's after RLI was formed.

In 2002, Marnell was terminated as an employee of RLI. Marnell sold his stock to Herrmann pursuant to the terms of a buy-sell agreement between the parties. Marnell was fired when he stopped showing up for work on a regular basis. Dixon had to cover Marnell's work. Dixon, Chapa and Herrmann made the decision to terminate Marnell.

Herrmann and Dixon each have been the owners of one hundred shares of common stock from November 2, 2000 to the present. Chapa has been the owner of one hundred shares of common stock of RLI from January 1, 2002 to the present. Herrmann, Dixon and Chapa have been the only shareholders of RLI since Marnell sold his one hundred shares of common stock to Herrmann on January 20, 2005, and Herrmann assigned those shares to RLI on February 8, 2005.

Dixon and Chapa have been directors and officers of RLI since at least October 6, 2003. Dixon is the president of RLI. He also is the construction foreman/supervisor. He makes sure crews have what they need to do jobs. He supervises crews in the field. RLI's peak seasons are April to June and October to December. Dixon is in the field 99% of the time during those seasons. March and April 2009 were a busy time and he worked 16 hours per day.

Chapa was hired by Stan's in 1995 to handle all aspects of the office. When RLI was created, she assumed an active role in daily decision-making. She does not have a job title. She does accounting and accounts receivable.

When an RLI business decision needed to be made, Dixon, Chapa and Herrmann would get

together in the office and make the decision. They made a lot of decisions without calling a formal directors meeting. They never had a shareholders meeting.

From at least January 2007 until approximately January 2009, RLI operated its business at 5817 N. Broadway Street, Wichita, Kansas 67219 ("Broadway Office"). In approximately January 2009, RLI moved its business operations to 3656 South West Street, Wichita, Kansas 67217 ("West Office").

**RLI Buy-Sell Agreement**

RLI, by its president Dixon, and Dixon, Marnell and Herrmann, individually, executed a Buy-Sell Agreement (the Agreement) on November 2, 2000.

Transfers of RLI stock are restricted by the provisions of the Agreement, Section III. Transfers, paragraphs A through G. The Agreement, Section III.D., provides for a sale of stock upon termination of a shareholder's employment with RLI:

> Should a shareholder's full-time or substantially full-time employment with the Company terminate for any reason other than the death or disability of the Shareholder, such Shareholder shall, within 120 days after such termination, irrevocably offer (in a written instrument delivered to the Company) to sell all shares of Stock registered in such Shareholder's name to the Company for the price and on the terms and conditions specified in Article IV. The Company shall have 30 days after actual receipt of such offer within which to advise such Shareholder whether the Company will so purchase such shares of Stock. If the Company does not so elect to purchase all such shares of Stock, the Company shall offer such right to purchase all such shares of Stock not being purchased by the Company to the other Shareholders as provided in paragraph F of this Article III. If the Company and the other Shareholders decline to purchase all such shares of Stock in accordance with the provisions of this Paragraph F, the option to purchase such Stock under this Paragraph F shall terminate; provided, however, the Shareholder shall continue to be a party to this Agreement and shall continue to own such shares of Stock subject to the terms and provisions of this Agreement in all respects. Normal and customary vacations, sick leave or other permitted leaves of absence shall not constitute termination of employment hereunder.

Article IV, Section A, Sales Price, provides that if a sale of stock is to be made pursuant to

any paragraph of Article III, except paragraphs A and G, the sales price shall be the current fair value for such shares determined by agreement of RLI with the selling shareholder or his representative, and if no such agreement can be made within thirty days, then at the current value as determined by three appraisers.

The Agreement was amended by the parties on January 1, 2002. 100 shares of common stock were issued to Chapa. Chapa agreed to the terms and conditions of the Agreement and became a party to the Agreement.

On February 26, 2009, Andrew Thengvall, attorney for Hermman, wrote Jerry Bogle, RLI's attorney, and requested RLI's stock ledger and RLI's financial statements for the past three fiscal years. The stated purpose of the request was to determine the fair value of plaintiff's RLI stock. The letter further stated that Hermann desired to sell his stock to either RLI, other shareholders or a third party. Herrmann did not expect he would remain an officer of RLI after he indicated a desire to sell his shares.

On August 28, 2009, plaintiff's attorney, Thengvall, sent a letter to RLI's attorney, Bogle, offering to sell plaintiff's stock to the company pursuant to Section III.D. of the Agreement. On September 16, 2009, Bogle, writing on behalf of RLI, Dixon and Chapa, replied by letter to Thengvall, stating, "Responding to your letter of August 28, 2009, my clients would consider an offer of sale from your client."

On October 7, 2009, Thengvall wrote Bogle stating, "You requested that we propose a specific purchase price for Mr. Herrmann's stock in Rain Link, Inc. Mr. Herrmann would sell his stock back to Rain Link for a purchase price of $330,000."

On February 9, 2010, Bogle wrote to Thengvall communicating an offer from RLI to

Herrmann in which RLI agreed to relieve Herrmann of liability as a guarantor for RLI's debts in exchange for an assignment of Herrmann's stock to RLI.   On March 24, 2010, Thengvall wrote to Bogle on behalf of Herrmann and stated that RLI's offer dated February 9, 2010 was not acceptable to Hermann. No further offers regarding the purchase of Herrmann's shares have been made by Herrmann, Dixon or Chapa.

**Herrmann's Disability and Medical Issues**

Herrmann has a permanent spinal cord injury. He is a C5-C6 quadriplegic. He has been a quadriplegic since an accident occurring on October 23, 1979.   Herrmann is paralyzed from his chest down. He has no movement or feeling in his fingers. He is able to move his arms and hands. He wears a brace to write. He uses a computer keyboard and types with his left thumb.

Herrmann attended Wichita State University from 1991 to 1994 and graduated with a degree in business administration. During the times he was unemployed from 1979 to 1994, he received Social Security disability and had a medical card for his attendant care.

Herrmann began working at Stan's in May 1994. When he reached a certain salary at Stan's, Herrmann stopped receiving Social Security disability benefits and lost his medical card. From 1994 through 2008, Herrmann was self-sufficient earning an income and doing a full-time job.

**Herrmann's Employment By RLI**

Throughout his employment, Herrmann was an employee at-will.   Herrmann was the task coordinator beginning in 1997. He was responsible for scheduling jobs and installations. He coordinated with general contractors and sub-contractors at project sites. He obtained permits and ordered One Call inspections. He communicated with customers regarding installations and

prepared files for billing. He took estimates prepared by RLI salesmen, did pricing and drew up contracts for residential projects. He invoiced customers and gave the permanent file to Chapa, who input information into the accounting system. He also helped order and check out parts.

From the time Herrmann started at Stan's, he was provided a telephone with a headset and a desk that accommodated his wheelchair. He does not need any other special equipment.

After November 2008, Herrmann requested a wheelchair ramp at the West Office. No special preparations were made in March 2009 regarding a ramp when Herrmann said he was coming back. It would not impose an undue hardship on RLI to install a wheelchair ramp at the main entrance to its West Office.

**Herrmann's Absence From Work**

In the summer and fall of 2008, Herrmann was having trouble with decubitus ulcers. Decubitus ulcers are a complication of quadriplegia. They occurred on his pelvis, buttocks and elbow. He did not feel these wounds because of his paralysis.

Dr. Stephen Olson of the Wound Clinic treated his ulcers. Dr. Olson would debride the wounds and he prescribed a "wound VAC" machine 24 hours a day 7 days a week that sucked fluids out of the wounds.

Herrmann was hospitalized from November 3, 2008 to November 11, 2008. On November 29, 2008, Dr. Olson performed surgery to irrigate and drain the left elbow abscess and noted an infection, methicillin-resistant staphylococcus aureus. On December 3, 2008, Infectious Disease Consultants, P.A. wrote Dr. Olson and advised Herrmann had developed an infection, methicillin-resistant staphylococcus aureus (MRSA), in all of his wounds.

Herrmann was discharged on December 3, 2008 with a sacral decubitus ulcer state 4 with

MRSA, a left elbow decubitus ulcer with MRSA, malnutrition, frequent urinary tract infection and a history of an intestinal infection, gastric ulcers and colonic polyps. He was released home for follow-up with an infectious disease specialist in one month and follow-up with Dr. Olson for his wounds.

Herrmann was back in the hospital on December 6, 2008 with a decreased level of consciousness due to his pain medications and all of the other pre-existing problems. He was discharged again on December 7, 2008 with the previous home care and medical follow-up instructions.

Herrmann was followed by Dr. Olson on January 7, 2009 for wound care. On January 21, 2009, Dr. Olson referred Herrmann to Dr. Schoonover for flap surgery on his wounds. On a follow-up visit on February 4, 2009, Dr. Olson indicated that Herrmann was to contact Dr. Schoonover to arrange flap surgery on the sacral wound and a right ischial wound and continue the wound VAC in the interim. Herrmann was resistant to having the surgery even though the doctor told him it was necessary if he wanted to keep living. Herrmann knew it was detrimental to his health if he did not have the surgery. From February to November 2009, Herrmann continued to have decubitus ulcers and refused to have the flap surgery.

On January 28, 2009, RLI's attorney, Bogle, sent a letter to Herrmann advising that he was being placed on unpaid medical leave of absence beginning January 16, 2009. Herrmann was notified he was being placed on unpaid medical leave effective January 16, 2009 due to his extended time off work.

In February, Herrmann called RLI and requested that Dixon and Chapa come visit him. On or about February 24, 2009, Dixon and Chapa visited Herrmann at his home.

On February 26, 2009, Herrmann was admitted to the hospital as a result of a drug overdose suicide attempt. He was admitted for depression and observation for possible worsening of his mental status. He was discharged on March 1, 2009. Chapa was notified of the suicide attempt.

During his stay, Herrmann consulted with Dr. D'Empaire for a psychiatric evaluation. Herrmann reported that he was "facing multiple stressors involving health, separation from wife, and work problems" and he was "grieving his loss of independence."   Dr. D'Empaire's assessment stated:

> AXIS I: Adjustment disorder with mixed disturbance of emotions and conduct.
> AXIS II: Deferred.
> AXIS III: Quadriplegia involving C5-C6, neurogenic bladder with indwelling suprapublic catheter, Escherichia coli urinary tract infection, history of multiple pressure ulcers with colonization of methicillin-resistant Staphylococcus aureus, status post intentional overdose, anemia.
> AXIS IV: Problems with primary support, occupational problems, economic problems, problems with access to healthcare providers.
> AXIS V: Global assessment of functioning 51.

**Herrmann's Return To Work Status**

On March 17, 2009, Herrmann's family physician, Dr. Friesen, provided an RX for "a trial of work beginning at 4-6 hrs per day."

**RLI's Decision To Terminate Herrmann's Employment**

On March 25, 2009, Herrmann called Chapa and requested to talk to her about returning to work.   The particulars of this conversation are in dispute.   Chapa contends that she told Herrmann to come back to work on March 30, 2009 and he said, "Okay."   Herrmann contends that he told Chapa that he had been released to come back to work part-time and he "wanted to come back to work," but Chapa told him she needed to speak to Dixon before he could return to work.

Herrmann said that Chapa said she would call him the following week and she never called back. Plaintiff did not come in to work on March 30, 2009.

RLI's Employee Manual, Section III, Compensation and Performance, states the company's policy concerning absences from work:

> Absence or Tardiness: If you are unable to report to work or if you will arrive late, you must contact the office immediately. If you know in advance that you will need to be absent, you are required to request this time off directly to your supervisor. If you are unable to personally call in due to illness or emergency, be sure to have someone call on your behalf. Absence from work for two (2) days without notifying the office will be considered a voluntary resignation.

RLI hired Connie Walls on February 24, 2009. She was hired to work part-time. Walls was hired to do Herrmann's job because no one was doing it except Chapa and Harold Schoeffler, the commercial salesman. Walls worked at plaintiff's desk.

No contemporary document was created in April 2009 recording the decision to terminate Herrmann.

**Post-Termination Communications With Herrmann and His Counsel**

On April 29, 2009, Herrmann's attorney wrote a letter to RLI's lawyer. The letter reflects three telephone calls by Herrmann, one to Chapa on March 25, 2009, and calls with Dixon on April 20 and 21, 2009. The letter indicates that on April 20, 2009, while on his way to report to work, Herrmann received a phone call from Dixon advising Herrmann not to report to work because the ramp had not yet been constructed. The letter indicates that on April 21, 2009, Dixon called Herrmann and told him not to come to work until Dixon and Chapa had talked with RLI's attorney.

Dixon did not tell Herrmann he had been terminated during the calls on April 20 or 21, 2009. Dixon and Chapa met with legal counsel on May 6, 2009. Following the meeting, one of RLI's attorneys, Paul McCausland, called Jay Rector, one of Herrmann's attorneys to advise him

that Herrmann would not be allowed back to work.

**Herrmann's Post-Termination Care and Physical Condition**

On April 15, 2009, wound care was provided by Dr. Stephen Olson to Herrmann. Dr. Olson continued to prescribe Wound VAC treatment for all wounds.

Herrmann announced to Dr. Olson that he unilaterally had stopped using the Clinitron (Air Fluidized Therapy) bed. Dr. Olson discussed the possibility of a worsening of his condition. Herrmann was told to get his life affairs in order, including a will and living will and Do Not Resuscitate orders.

On April 15, 2009, Dr. Olson wrote an RX, "OK to Return To Work 4/20/09 4-6 hr/day."

Herrmann made a disability report to Social Security and applied for Social Security benefits in February 2009. He reported he was disabled from working beginning November 20, 2008. He received a determination from Social Security granting him disability benefits. He began receiving Social Security disability benefits on June 3, 2009 in the amount of $2,351 per month. He has received those benefits continuously since June 3, 2009.

On March 1, 2010, Dr. Friesen wrote a "To Whom It May Concern" letter. The letter stated, "Wayne has been a patient of mine for several years now and he does have a permanent paraplegia. At this time he is not able to work and requires some help with self-care, and uses a wheelchair for mobility purposes."

**RLI's Employment Practices**

In 2006, 2007 and 2008, Dixon, Chapa and Herrmann received equal bonuses. In 2009, Dixon and Chapa each received a bonus of $12,000. Herrmann did not receive a bonus in 2009. In March 2010, Dixon and Chapa each received a bonus of $7,500.

IV.

A. ADA–-Title I/KAAD Claims

In this case, plaintiff claims that RLI discriminated against him because of his disability, quadriplegia with decubitus ulcers. Plaintiff alleges the following claims against RLI based upon the ADA and the KAAD[1]: (1) discrimination by failing to accommodate his disability; (2) denial of employment opportunities on the basis of his disability when it terminated his employment; and (3) retaliation when he opposed an act or practice made unlawful by the ADA and the KAAD. RLI contends in its motion that it is entitled to summary judgment on all of these claims.

1.    Termination

RLI contends that it is entitled to summary judgment on plaintiff's claim that he was denied employment opportunities on the basis of his disability when he was terminated from RLI's employment discrimination because (1) plaintiff is not a qualified individual under the ADA; (2) plaintiff was not able to perform the essential functions of his job, with or without reasonable accommodation; and (3) plaintiff was not terminated because of his disability.

The parties have stipulated that plaintiff is disabled within the meaning of the ADA.   The issues before the court are whether:  (1) plaintiff is a qualified individual under the ADA; (2) plaintiff is able to perform the essential functions of his job, with or without reasonable accommodation; and (3) RLI terminated plaintiff because of his disability.

---

[1]The same standards and burdens applied to an ADA claim are also applied to a KAAD claim.   Aramburu v. Boeing Co., 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997).   The court shall focus on plaintiff's ADA claims with the understanding that the court's comments on the ADA claims are applicable to plaintiff's KAAD claims.

The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to ADA discrimination claims. Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011). Under this framework, a plaintiff must first establish a prima facie case of discrimination by showing that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1037–38 (10th Cir. 2011) (internal quotation marks omitted). "In order to demonstrate discrimination, a plaintiff generally must show that he has suffered an adverse employment action because of the disability." Id. at 1038 (internal quotation marks omitted).

If a plaintiff establishes his prima facie case, "the burden would shift to [the defendant] to articulate some legitimate, nondiscriminatory reason for its actions" and the plaintiff "would then bear the ultimate burden of showing that [the defendant's] proffered reason is in fact a pretext designed to mask discrimination." Carter, 662 F.3d at 1141 (internal quotation marks omitted).

The court has undertaken a thorough review of the vast discovery record. This is not the typical employment discrimination case between an employer and an employee. Here, the plaintiff was part-owner of the business. As a result, his views are much more important than the beliefs or thoughts of a typical employee. He obviously helped to establish certain policies for the business and his statements about the duties of his job or thoughts about the structure of the business have increased importance.

RLI contends that the record shows the following concerning whether plaintiff was qualified: (1) plaintiff was not able to perform his essential job functions, even on a part-time basis from November 2, 2008 to March 25, 2009; (2) plaintiff failed to report to work or call in with an excuse for his absence on March 30, 2009, and RLI had no knowledge of the reasons for plaintiff's absence until after April 13, 2009, the date that RLI officers made the final decision to terminate plaintiff's employment and replace him with a new hire; and (3) plaintiff was not able to perform the essential functions of his job even after April 13, 2009.

Under the ADA, only individuals who are qualified for the job they seek may state a claim for discrimination. As noted previously, the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). A qualified person must be "able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979).

To prove that he was qualified for the task coordinator position, plaintiff must produce evidence that: (1) he could perform the essential functions of the job or (2) if not, whether any reasonable accommodation by his employer would enable him to perform those functions. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1190 (10th Cir. 2003). "Essential functions" are the fundamental duties, not the "marginal functions of the position." Id. at 1191. Determining whether a particular duty is "essential" is a factual inquiry based on a number of factors, including but not limited to the employer's judgment as to what duties are essential and any written job description the employer prepared for the position. 42 U.S.C. § 12111(8); Davidson, 337 F.3d at 1191 ("Determining whether a particular function is essential is a factual inquiry."). Other factors

include (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs.   29 C.F.R. § 1630.2(n)(3).

The issue here is whether "full-time" employment was an essential function of the job of "task coordinator."  Plaintiff has suggested that the evidence shows that RLI did not actually require the task coordinator to work full-time.  Plaintiff contends that RLI's admission that full-time employment is "important," not "essential," is fatal to its defense.

The examination of this issue, like many of the issues before the court, is difficult due to various arguments raised by the parties and the failure of one side to respond to the matters raised by the other side.   Despite the difficulties, the court shall jump into an analysis of this issue.

In support of its argument that the position of task coordinator was a full-time job, RLI relies almost exclusively on the testimony of the plaintiff in his deposition where he stated that the job of task coordinator required "at least" eight hours a day five days a week to get everything done.   Plaintiff, however, disputes that the position was a "full-time" position for several reasons. He points to the following: (1) he was allowed to work part-time in that position in 2003 when he returned from leave; (2) he was "forced" to work part-time prior to his leave in November 2008; and (3) the person purportedly hired to replace him as task coordinator "could not and did not ever work full-time."

The court notes that RLI failed to address the aforementioned contentions of plaintiff in its reply brief.  RLI simply reiterated that plaintiff could not work full-time.  RLI did contend, relying upon Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), plaintiff's application

for disability benefits negated an essential element of his ADA claim that he could perform the essential functions of his job. RLI suggests that plaintiff has ignored and failed to address his representation in his social security application that he was unable to work beginning November 20, 2008.

If the court were to find that the position of task coordinator was a full-time position, RLI would be entitled to summary judgment on plaintiff's ADA claim because plaintiff has admitted that he could not work full-time at the time he was terminated. Thus, plaintiff would not be qualified under the ADA because he could not perform the essentials functions of the position. See, e.g., Brooks v. Lab. Corp. Of America, 2005 WL 2250827 at *14(W.D.Mo. 2005)(employee who has a full-time position, but who is only to able to return to work on a part-time basis, is not qualified to perform the essential function of the full-time position); Nance v. Quickrete Co., 2007 WL 1655154 at * 2-5 (W.D.Va. 2007)(employee who can only work part-time is not a qualified individual with a disability under the ADA if full-time work is essential to the job).

Viewing the evidence in the light most favorable to the plaintiff, the court believes there are disputed issues of genuine facts on whether "full-time" employment was an essential function of "task coordinator." In reaching this conclusion, the court is not entirely persuaded that the evidence offered by plaintiff concerning his past treatment at RLI supports his contention that the position was part-time. As stated by the Tenth Circuit:

> [A] plaintiff cannot use her employer's tolerance of her impairment-based ostensibly temporary nonperformance of essential duties as evidence that those duties are nonessential. To give weight to such a fact would perversely punish employers for going beyond the minimum standards of the ADA by providing additional accommodation to their employees.

Robert v. Board of County Commissioners of Brown County, 691 F.3d 1211, 1217 (10th Cir.

2012).

The evidence before the court shows that RLI allowed plaintiff to work part-time in 2003 due to the medical problems that arose as a result of his disability. The evidence also shows that plaintiff was "forced" to work part-time in 2008 because of the medical problems that arose as a result of disability. In each instance, plaintiff offers no evidence to support the contention that the job of task coordinator suddenly became a part-time job. RLI has offered evidence that it took these steps to "allow" plaintiff to continue to work in his position. As noted above, it would be wrong to punish RLI for these actions.

The court, however, is persuaded that there is some evidence in the record that the position was part-time based upon the subsequent hiring of plaintiff's replacement. RLI has acknowledged that Connie Walls was hired to replace the plaintiff. RLI has have further admitted that she was hired part-time and was never made a full-time employee. These admissions have some significance even though all of the facts do not support the contention that she performed all of the functions of the position of task coordinator. "The question of whether a job requirement is a necessary requisite to employment initially focuses on whether an employer actually requires all employees in the particular position to satisfy the alleged job-related requirement." Tate v. Farmland Industries, Inc., 268 F.3d 989, 993 (10th Cir. 2001)(citing Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995)); see also Davidson, 337 F.3d at 1191; Robert, 691 F.3d at 1217. In light of RLI's admissions, the court believes there is evidence in the record that the position of task coordinator was not a full-time position. Thus, the court does not find that summary judgment can be granted to RLI based upon this argument.

RLI, relying upon Cleveland, has also suggested plaintiff's application for disability

benefits negates an essential element of his ADA claim that he can perform the essential functions of his job. RLI contends that plaintiff has ignored and failed to address his representation in his social security application that he was unable to work beginning November 20, 2008.

In Cleveland, the Supreme Court considered "the legal effect upon an ADA suit of the application for, or receipt of, disability benefits." 526 U.S. at 800. Carolyn Cleveland applied for Social Security Disability Insurance (SSDI) before filing her ADA suit against her former employer. Id. at 798–99. To determine the legal effect of Cleveland's SSDI claim upon her ADA claim, the Supreme Court engaged in a two-part analysis. First, it determined whether, as a legal matter, a claim under the ADA "inherently conflict[s]" with an SSDI claim to warrant a "negative presumption" against the ADA claim. Id. at 802; see also id. at 802–05. Second, after finding no inherent conflict, the Court analyzed whether Cleveland's SSDI claim "genuinely" conflicted with her ADA claim so as to "negate an essential element of her ADA claim." Id. at 805–06. Where genuine conflict exists, the Court held that a plaintiff could overcome summary judgment by offering a "sufficient explanation" for any inconsistency. Id. at 806.

The court finds that there is "sufficient explanation" for the inconsistency in the record. In his deposition, plaintiff explained that he sought the disability benefits because he was unable to work at that time. This explanation coupled with his contention in this case that he could perform the job responsibilities as task coordinator with RLI with reasonable accommodations is adequate to meet the requirements of Cleveland. Plaintiff's claim that he can perform his job with a reasonable accommodation could prove consistent with his disability-benefit application stating that he could not perform his job without it. See Cleveland, 526 U.S. at 803. The fact plaintiff claims he is disabled for purposes of disability benefits does not contradict a claim under the ADA.

The ADA protects persons who can perform their jobs with reasonable accommodation, while Social Security disability does not take into account the need for accommodation.

RLI next contends that the record shows that plaintiff has no evidence that he was terminated because of his disability. RLI argues that the record shows that plaintiff was terminated because he abandoned his job. RLI suggests that the evidence shows he was terminated because he did not communicate with Dixon and Chapa about his need for leave and his prognosis for returning to work. RLI further contends that the evidence shows plaintiff was terminated because it needed someone to perform his job and he did not show up or explain his absence. They assert they simply followed the written policy contained in the Employee Manual.

Plaintiff contends that he has established a prima facie case of ADA discrimination concerning his termination. He notes there is no dispute that he is a person with a disability. He further contends that the second element--whether he is a qualified--turns on disputed facts concerning whether "full-time employment" was an essential function of the job. Finally, he asserts that there is evidence to support the third element--that he was discriminated against because of his disability. He argues that the direct evidence, as well as the circumstantial evidence such as temporal proximity between his protected activities which include taking leave in fall 2008, requesting a ramp in February and April 2009, requesting a return to work on a part-time schedule in March and April 2009 and RLI's adverse actions which were taken between January and May 2009 satisfy the low hurdle for establishing a prima facie case.

Plaintiff further contends that RLI's "constantly shifting, false, and trumped reasons for terminating [him] and their post-hoc fabrication of documents to support the termination" are sufficient to establish that the reasons offered by RLI are mere pretexts for unlawful discrimination.

Plaintiff points to the following: (1) defendants initially told him that he could not come to work because they did not have a ramp; (2) after they announced his termination on May 6, 2009, they gave no reason for their action; (3) defendants' counsel asserts that the defendants had already determined that he had abandoned his job and replaced him due to lack of productivity dating back to Spring 2008 and that he had not shown up for work or called in since October 28, 2008 when he in called on March 25, 2009 and stated he had a release; (4) in July 2009, defendant told the KHRC they had never terminated plaintiff but that he had abandoned his job; (5) in March 2010, defendants documented an April 13, 2009 special meeting in which they indicated that plaintiff had voluntarily given up his employment based upon his failure to communicate concerning unexplained absences since being placed on unpaid leave on January 16, 2009 and general lack of productivity when present; (6) in his deposition, Dixon said that the defendants terminated plaintiff because it was RLI's busy season and they needed someone to do the job, but later testified that plaintiff was not terminated because RLI was busy but because he did not report on March 30, 2009; (7) Chapa testified in her deposition that the defendant accepted plaintiff's resignation on April 13, 2009 and made the decision to move forward without plaintiff; (8) Chapa and Dixon both testified that they replaced plaintiff by making Walls a full-time employee at that time; and (9) defendants have contended that plaintiff was terminated for violating RLI's attendance policy. Thus, plaintiff suggests that there is a genuine dispute as to whether defendants' stated reasons for his termination--failure to communicate or report to work and total abandonment of his job--are pretexts for discrimination.

Once again, the court is not persuaded that RLI is entitled to summary judgment on this argument. There are simply too many genuine issues of fact that remain in dispute. Plaintiff has

offered evidence showing that RLI's preferred non-discriminatory explanations for its actions are so inconsistent that a rational factfinder could conclude they are unworthy of belief. Thus, plaintiff has adequately shown that RLI's reasons for terminating him may be pretextual.

2.   Reasonable Accommodations

Plaintiff contends RLI discriminated by failing to accommodate him and denying him employment opportunities on the basis of his disability when it refused to accommodate this disability. Specifically, plaintiff contends that RLI (1) should have granted him medical leave during the four months he was unable to work due to the illnesses caused, at least in part, by his decubitus ulcers;   (2) should have allowed him to work part-time; and (3) should have provided him with wheelchair ramp to access the West Office.   RLI contends that the record shows that it did not discriminate against plaintiff by failing to accommodate him and denying him employment opportunities on the basis of his disability.

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to ... discharge of employees ... [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Actionable discrimination under the ADA takes many forms, one of which is when an employer fails to provide a disabled employee a reasonable accommodation. See id. § 12112(b)(5)(A); see also C.R. England, 644 F.3d at 1048 ("The [ADA] ... establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." (quoting Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001)) (internal quotation marks omitted)); Davidson, 337 F.3d at 1188–89 ("[A] separate claim of discrimination can be stated under the ADA for failing to provide a reasonable accommodation.").

The ADA defines "reasonable accommodation" to "include"

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); accord 29 C.F.R. § 1630.2( o).

The court is persuaded that genuine issues of material fact remain on each of the claims raised by the plaintiff. The court believes that little would be served by analyzing each of these claims. The court has previously addressed RLI's arguments concerning the termination of plaintiff and the failure to allow him to return to work on a part-time basis. Those discussions are equally applicable here. There are multiple genuine issues of fact concerning whether RLI's stated reasons for taking these actions were pretextual. Thus, the court must deny summary judgment to RLI on these claims.

3. Retaliation

Plaintiff contends that RLI retaliated against him for seeking an accommodation of his disability and return to work following his medical leave by terminating his employment. RLI contends it is entitled to summary judgment on this claim because (1) there is no causation since they terminated plaintiff before he engaged in any protected activity; and (2) they terminated him for legitimate, non-discriminatory reasons.

Plaintiff asserts that he engaged in protected activity before he was terminated. He suggests that the evidence, when viewed in the light most favorable to him, shows that he (1) requested an accommodation and received an accommodation in November 2008 when he went on

paid leave; (2) engaged in protected activity on March 25, 2009 when he told Chapa he had a doctor's release to return to work and asked to return on a part-time schedule; and (3) continued to engage in protected activity by repeating his request to return to work from April 17 through May 6, 2009.

The ADA prohibits "discriminat[ion] against any individual because such individual has opposed any act or practice made unlawful by this chapter" and "interfere[nce] with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(a) and (b). Plaintiff's ADA retaliation claim is also subject to the McDonnell Douglas burden-shifting analysis. To make out a prima facie case, plaintiff must show (1) he engaged in a protected activity, (2) his employer took a materially adverse action, and (3) a causal connection exists between the protected activity and the adverse action. Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). To survive summary judgment, plaintiff must show that there is a genuine issue of material fact as to whether the defendant's proffered reason for the challenged action is pretextual—i.e., unworthy of belief. Kendrick v. Penske Transp. Servs. Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). Plaintiff "can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(internal quotation marks omitted). But "mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1225 (10th Cir. 2007)(alteration and internal quotation marks omitted).

The court finds that plaintiff has established a prima facie case of retaliation. The

temporal proximity between plaintiff's requests for accommodations and his subsequent termination is sufficient to establish causation. RLI has suggested once again that plaintiff was terminated for legitimate business reasons. Again, the court finds that genuine issues of fact are present concerning whether RLI's proffered reason for termination is pretextual. The court shall deny RLI's motion for summary judgment on plaintiff's claim of ADA retaliation.

B. ADA--Title III claims

RLI contends that plaintiff's Title III claim under the ADA must fail because (1) RLI is not a place of public accommodation and (2) employees are not covered individuals.

Title III of the ADA prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability. See 42 U.S.C. § 12182(a).

Thus, Title III applies to particular places and persons. "The place must be a 'place of public accommodation,' and the person must be an 'individual' seeking 'enjoyment of the goods, services, facilities, privileges, advantages, or accommodations' of the covered place." PGA Tour, Inc. v. Martin, 532 U.S. 661, 692 (2001)(Scalia, dissenting)(citing 42 U.S.C. § 12182(a)).

RLI initially argues that its office is not a place of public accommodation because it is not open to clients and customers. RLI also contends, relying upon Bauer v. Muscular Dystrophy Ass'n, Inc., 288 F.Supp.2d 281 (D.Kan. 2003), that plaintiff fails to state a claim under Title III because he was a co-owner of the RLI and was not seeking the use of its office as a public accommodation. Plaintiff asserts that RLI's office is a place of public accommodation because it is a sales and service establishment. Plaintiff further argues that RLI's contentions about Title III's inapplicability to employees lack merit because he brings this claim as a stockholder, not as an

employee.

The court begins with the issue of whether RLI is a place of public accommodation. Title III and the regulations promulgated to implement it define "place of public accommodation" as a "facility, operated by a private entity, whose operations affect commerce and fall within at least one" of twelve specified categories. 28 C.F.R. § 36.104. The categories list various private entities that qualify as public accommodations including sales establishments. See 42 U.S.C. § 12181(7)(E).

Viewing the evidence in the light most favorable to the plaintiff, the court is persuaded that RLI is a place of public accommodation. The court reaches this conclusion based upon the evidence provided by the plaintiff. Plaintiff acknowledges that most of RLI's sales and service activities occur in the field. However, plaintiff notes that RLI's business office is open to clients, customers and vendors. Plaintiff has offered evidence that some customers occasionally pay bills or purchase replacement parts at the office and some vendors make sales visits to the office. Plaintiff has also indicated that RLI hangs an "open" sign in a window at its office during business hours. These facts adequately suggest that the business office of RLI is a place of public accommodation for the purposes of Title III. See, e.g., Sapp v. MHI Partnership, Ltd., 199 F.Supp.2d 578, 584-85 (N.D.Tex. 2002)(sales office within model home was place of public accommodation).

Plaintiff has not challenged the defendant's contention that employees cannot assert a Title III claim. Rather, plaintiff has argued that he brings this claim as stockholder. He asserts that he attempted to attend meetings as a stockholder and the barriers at the RLI office prevented him from entering or exiting the facility. The court notes that RLI has not responded to this argument.

26

Accordingly, we are not inclined to grant summary judgment to RLI on plaintiff's Title III claim.

V.

The court shall next consider plaintiff's shareholder claims. Relying on theories of common-law breach of fiduciary duty and oppression of a minority shareholder, plaintiff contends that defendants Dixon and Chapa owed him fiduciary duties in their capacities as directors, officers and majority shareholders. In the pretrial order, plaintiff alleged the illegal actions of Dixon and Chapa included: (1) placing him on unpaid medical leave; (2) terminating his employment; (3) denying him return on his investment as a shareholder; (4) taking excess compensation from the company; (5) attempting to purchase his shares at an unfair price; and (6) disregarding the requirements of the Kansas Corporation Code and the governing documents of RLI. In the response to defendants' motion for summary judgment, plaintiff indicated that defendants engaged in illegal actions by: (1) terminating his employment; (2) denying him a dividend; (3) compensating themselves excessively; (4) offering an unfair price for his shares and (5) excluding him from management. The court shall assume that plaintiff is abandoning his claims that the defendants violated their fiduciary duties by placing him on unpaid medical leave.

Under Kansas law, directors and officers of a corporation have a strict fiduciary duty to act in the best interests of the corporation and its stockholders. See Becker v. Knoll, 291 Kan. 204, 208, 239 P.3d 830 (2010); Newton v. Hornblower, Inc., 224 Kan. 506, 514, 582 Kan. 1136 (1978). A fiduciary generally must act with fairness and in good faith toward the person to whom the obligation is owed and may not convert opportunities or circumstances to his or her own financial advantage at the expense of that person. See Becker, 291 Kan. at 208; Goben v. Barry, 234 Kan. 721, 728, 676 P.2d 90 (1984). There is no dispute that Dixon and Chapa, acting together as

majority shareholders and directors, owed a fiduciary duty to plaintiff as a minority shareholder.

Even if the actions of Dixon and Chapa did not violate their fiduciary duties, they might still constitute oppressive conduct. "Although courts differ in their approaches as to what constitutes 'oppressive conduct,' such conduct usually occurs where the majority shareholder engages in a series of otherwise legal acts, which effectively prevent the non-controlling shareholder from participating in the operation and management of the corporation." Ayres v. AG Processing Inc., 345 F.Supp.2d 1200, 1206 (D.Kan. 2004)(citations omitted). In Kansas, the complaining minority shareholder must overcome the business judgment rule not by making general allegations of unfairness but by showing that the majority's conduct was otherwise fraudulent. Richards v. Bryan, 19 Kan.App.2d 950, 964, 879 P.2d 638 (1994)(quoting Sampson v. Hunt, 233 Kan. 572, 584-85, 665 F.2d 743 (1983)).

After an exhaustive review of the many arguments of the parties and consideration of applicable law, the court determines that genuine disputes of material fact exist as to all claims. No purpose is served by the court writing a detailed analytical opinion discussing these issues when there are disputed facts that will necessarily have to be decided by a jury. The court will only briefly touch on a few of the arguments raised by the parties.

The defendants contend that the facts of this case show that they did not violate their fiduciary duties in terminating the plaintiff because he was fired for abandoning his job and being a no-show on March 30, 2009. Thus, defendants argue that plaintiff was terminated for a legitimate business reason. Plaintiff counters that the evidence fails to show that he was terminated for a legitimate business reason. The court agrees. For the reasons previously stated in the court's discussion of plaintiff's ADA claim, we must conclude that dispute issues of genuine

fact preclude the entry of summary judgment to the defendants on this claim. The record is not clear whether defendants had a legitimate reason for terminating plaintiff. Accordingly, the court must deny summary judgment to the defendants on this claim.

The defendants next contend that they did not violate their fiduciary duties in failing to pay plaintiff dividends. The defendants contend that plaintiff was not entitled to bonuses or dividends for 2009 and the subsequent years because he was not contributing to the company's profitability during those periods. Plaintiff asserts that the defendants paid themselves constructive dividends and denied him his share of the profits.

The court is again not persuaded that the defendants are entitled to summary judgment on this claim. The issue of whether the payouts made by the defendants were bonuses or dividends and whether those payments needed to also be made to the plaintiff are issues that require a full examination of the facts. The present record before the court does not establish that the defendants are correct as a matter of law. The "bonuses" issued by the defendants had some characteristics of a "constructive dividend." See Yates v. Holt-Smith, 768 N.W.2d 213, 218(Wis.App. 2009).

The defendants next argue that they did not violate the buy-sell agreement that existed between the shareholders. They further argue that plaintiff cannot obtain the relief he has requested--dissolution of RLI or, in the alternative, an appraisal of RLI at defendants' expense and the purchase of his shares at fair value--because plaintiff has not stated a claim under Kansas Corporation Code. The defendants assert that RLI is not a close corporation under the Kansas Corporation Code and, thus, plaintiff cannot assert a claim against them based upon an allegation that RLI is a common law close corporation.

The court finds no support for defendants' position that plaintiff cannot assert a claim based on the contention that RLI is a common law close corporation. The defendants rely upon Lightner v. Lightner, 46 Kan.App.2d 540, 266 P.3d 539 (2011) for support of their position. The court believes that the defendants have read Lightner too broadly. Although Lightner hints that Kansas does not recognize common law close corporations, the court ultimately fails to so hold. 46 Kan.App.2d at 547. The Lightner court ultimately concluded that a shareholder can bring a direct action against officers or directors including claims of self-dealing or breach of fiduciary duty when the corporation is closely held and the plaintiff can prove that the action will not unfairly expose the corporation to a multiplicity of actions, materially prejudice the interests of a creditor of the corporation, or interfere with the fair distribution of the recovery among all interested persons. Id. at 552. Lightner does not ultimately distinguish between statutory and nonstatutory close corporations for this purpose. Thus, the court does not find, for the reasons stated by the defendants, that plaintiff cannot pursue the claims asserted here. The remaining claims involve disputed issues of fact which cannot be decided on summary judgment.

VI.

Finally, RLI contends that plaintiff cannot recover the 2009 bonus by invoking the KWPA. Plaintiff claims that if the "bonuses" paid to the owners are deemed wages and not constructive dividends, then defendants violated the KWPA when it failed to pay him his bonus for 2008. Plaintiff contends that he earned a bonus for calendar year 2008 payable in March 2009 and that RLI wrongfully withheld the bonus from him. He further contends that RLI's acts were willful. The defendants argue that plaintiff did not have a contract and was an at-will employment. As a result, RLI asserts that plaintiff was not entitled to a bonus because he was not a full-time

employee when the bonuses were paid.

Employers must pay "all wages due" to their employees.  K.S.A. § 44-314.  Once all conditions precedent to earning wages are satisfied, they are "earned" and must be paid, even if the exact amount of the wages cannot be calculated and are not payable until some subsequent event. Weinzirl v. Wells Group, Inc., 234 Kan. 1016, 1020-21, 677 P.2d 1004 (1984).

Again, the court finds that disputed issues of fact remain to be decided on this claim. Accordingly, defendants' motion for summary judgment on this claim shall also be denied.

VI.

In sum, the court shall deny defendants' motion for summary judgment.   Issues of genuine fact remain to be determined on each of the claims alleged by the plaintiff.   Thus, these claims shall be decided by a jury at trial.   In making that statement, the court believes that all parties to this litigation would be served by a fair and reasonable settlement.   The court hopes that such a resolution can be reached but, if not, the court will schedule the matter for trial.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (Doc. # 131) be hereby denied.

**IT IS SO ORDERED.**

Dated this 24th day of April 2014, at Topeka, Kansas.


 s/Richard D. Rogers
Richard D. Rogers
United States District Judge